THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* JOSÉ MANUEL PRADOS GARCÍA, Defendant and Appellant.

No. CR-69-99.     Decided November 5, 1970.

tive application; or

"(6) Any other reason justifying relief from the operation of the judgment."

374

*Ángel Viera Martínez* for appellant. *Gilberto Gierbolini, Solicitor General,* and *J. F. Rodríguez Rivera, Deputy Solicitor General,* for The People.

PER CURIAM: Defendant was accused of murdering his wife, Evangélica Jiménez Rivera. Informations of murder

in the first degree, assault to commit murder, and violations of §§ 8 and 6 of the Weapons Law, were filed against him. He was found guilty of murder in the first degree, aggravated assault, and of carrying and possession of weapons, being ordered to serve life imprisonment, two months in jail, from one to four years in the penitentiary, and one year in jail, respectively. On February 19, 1968, he filed motion for new trial which was denied. He took appeal from all judgments, as well as from the order denying a new trial.

The events occurred on December 2, 1964, about 7:30 p.m. The evidence presented during the trial was very abundant. The first witness for the prosecution was Ángel Luis Flores Arzuaga, who testified that he was the godfather of appellant's child and the husband of appellant's sister-in-law (married to a sister of the victim, daughter of Armando Jiménez). On the night of the events he was in Armando Jiménez' house until about 7 p.m., then he went to his house in Urbanización El Comandante, and a few minutes after arriving there he received a telephone call, for which reason he went with his wife and children to the scene of the events, Armando Jiménez' house. In one of the corners of the first room of the house he saw a pool of blood. From there he went to the hospital in Carolina, where he saw Evangélica Jiménez in an automobile in front of the hospital. He felt her pulse "to see if she was alive, and she was dead." (Tr. Ev., Part I, 91.) Some days before, he had gone with appellant to visit a spiritist in Bayamón, and on the way to that place the former had told him "that he wanted to sell his business equipment, and that if he could not sell it, he was going to kill his wife and children, and then he was going to shoot himself," and that he tried to dissuade him from his purpose. (See Tr. Ev., Part I, 94.) He informed defendant's statements to Evangélica Jiménez. On November 28, 1964, in a visit paid by defendant to the witness in his business, the former stated that he needed a revolver, to which the witness answered that

he could not provide one for him. He also said that in the year 1963 the defendant had lost a revolver in a gas station. (Tr. Ev., Part I, 113–116.)

The second witness for the prosecution was José Luis Rivero Cervera, who testified that he was the deceased's relative and who identified the corpse in Forensic Medicine. (Tr. Ev., Part II, 301.)

The third witness for the prosecution was Oscar Landrau, who testified that he was the owner, on the day of the events, of Farmacia La Providencia, located in De Diego Street in Carolina. That he had a .45 caliber Smith and Wesson revolver, and had a license to carry weapons. That he kept the revolver in a wardrobe in the rear part of his pharmacy and that defendant knew about this fact. That on the day of the events appellant went to his business a short time before 7 p.m. and went in to make a telephone call, but the telephone was out of order. That he left the pharmacy to make the call and some time later he returned. That he treated him with a drink from a bar next door to the pharmacy, to which there was access through the rear part of the pharmacy where the wardrobe was located. That he finished his drink and continued watching the television program Taberna India, and that defendant left the pharmacy upon termination of said program about 7:30 p.m. About 8 p.m. he noticed that the revolver was missing. That it was loaded with four steel jacketed bullets and two lead bullets. He also testified that he trusted defendant and that the latter could go inside his business. (Tr. Ev., Part II, 329–338.)

The fourth witness for the prosecution was Manuel Santos Aragón, owner of the bar in Muñoz Rivera Street in Carolina. He testified that on the day of the events defendant entered his business between 7:30 and 8:00 p.m. That he told him: "I come in order that you hand me over to the police, I killed my wife." (Tr. Ev., Part II, 395.) That he laid the revolver on the counter. That he became nervous and left

the business, and that another person took him to the police station. That he did not notice any bloodstain on defendant's shirt or on his pants. That he closed the business and went to his home. That he was the friend of both, defendant's and the deceased's family.

The fifth witness for the prosecution was Juan Medina Morales, retired from the Police of Puerto Rico. On the date of the events he was a Police Sergeant and was rendering services in Carolina. He testified that on the night of the events he was serving the 8 to 4 a.m. shift in the police station, and that the defendant appeared there and handed him a revolver. That upon delivering the revolver he stated "I just shot my wife with this revolver." (Tr. Ev., Part II, 420.) That he also informed him that the revolver belonged to Landrau. That he arrested him.

The sixth witness was Armando Jiménez Rivero, the deceased's father. He testified that he was a merchant and that he had an auto-parts business situated in the entrance to Rolling Hills, on the old road to Carolina, next to his residence. That on the date of the events his daughter Evangélica had been living in his house with her children for two weeks, being separated from her husband. That on the night of the events he had taken defendant's oldest son to buy some ice cream at El Caporal, on 65 de Infantería highway. That when he returned he delivered the child to his wife at the back door of his house and that he went to his business to fill out some orders for auto parts. It was about 7:15 p.m. Some time after he was in his business he heard some cries saying, "Daddy, daddy, he kills me," (Tr. Ev., Part II, 474), and he heard some shots. Upon hearing them he went running to his house and entered through the back door which was open, meeting his wife in the dining room with her hands on her head. Upon seeing him his wife told him: "Oh, Mandín, he killed her, Mandín, he killed her." (Tr. Ev., Part II, 476.) That at that very moment defendant was trying to open the

front door of the house and that all at once the latter fired at him. That he does not know how many shots he heard, only that the shots were continuous. That he ran to the kitchen and took a revolver which belonged to his brother Harry Jiménez, and which was on top of a cabinet (about five or six feet high) and ran to the dining room, always protecting himself with the wall, and fired two or three times at defendant, while the latter was trying to open the door. (Tr. Ev., Part II, 487.) At this moment, defendant opened the door and left the house, and the witness then went to the room where his daughter was lying in a pool of blood. That then he ran out of the room and went out of the house through the rear part and the defendant was already getting on his bus and going toward the road to Carolina. The witness went after him but he lost sight of him, returning to his house again at the time when they were taking his daughter to the hospital. That they took her to the hospital in Carolina.

The seventh witness for the prosecution was special agent Teodoro Marcucci Cruz. He testified in relation to what he had observed during the investigation at the scene of the events. That in the room there was a bed, a chest of drawers, a pool and stains of blood, and bullets. (Tr. Ev., Part III, 926.) That the room had one door. That there were two bullets on the floor (one in the pool of blood and the other one nearby), there was a bullet imbedded in the chest of drawers (on the upper drawer), and another one in the living room. (Tr. Ev., Part III, 940.)

The eighth witness for the prosecution was Dr. Néstor Loinaz, who was the forensic pathologist who performed the autopsy on the victim's body. He testified that the death was the result of the multiple bullet wounds on the neck and thorax, which fractured the spinal column and lacerated the spinal cord and the subclavian artery. He also testified that the deceased had received six bullet wounds. (Tr. Ev., Part IV, 120–134.)

The ninth witness for the prosecution was Tomasa Rivera Jiménez, the victim's mother. She testified that on the date of the events her daughter had been living with them for two weeks. That two weeks before the events she had gone to her daughter's house, finding her with bruises on one eye, her mouth swollen, and bruises on one hand and arm. She decided to take her and the children to her house (Tr. Ev., Part IV, 292–294). That on the night of the events her husband had gone with appellant's oldest son to buy some ice cream for him and when he returned about 7:30 p.m. he handed her the child at the door, and went to the business without entering the house. That her daughter had talked on the telephone with defendant that night at about 7:15 for about 15 minutes. That about 7:30 defendant arrived at her house and that her daughter saw him through the room window and told her so, ordering her to lock the door. That the back door through which the child had entered was ajar. That defendant entered and knocked at the bedroom door and she became nervous and opened it. That the defendant was not bringing anything in his hand and that she tried to push him with both hands. (Tr. Ev., Part IV, 314–316.) That defendant pushed her and she fell against the wall and that the defendant immediately took out the revolver from his waist band and pointed upwards. That her daughter, who was sitting on the edge of the bed, stood up and started to yell "daddy, daddy, he kills me," raising her hands up, and right then defendant started to shoot. (Tr. Ev., Part IV, 316–317.) After the shooting defendant went out towards the exit door of the living room leading to the porch. That then her husband came in running and then the defendant fired at him and her husband fired at defendant. That her husband was not carrying any weapon in his hand. That the defendant could finally open the door and fled, and that she went to the front of the house yelling, "Magín, Magín, he killed her, run, he killed Babeling." (Tr. Ev., Part IV, 326.) One of the first persons to arrive was

Luis Magín Velázquez. Upon being questioned by the defense she testified that she did not know whether buttons were loosened from defendant's shirt when she pushed him. She assured also that her husband was not carrying a revolver before the events, and that she had not seen a revolver in her house at any time before the events. She also testified that before the shooting she remained quiet and nervous and that she did not call anybody.

The tenth witness for the prosecution was Luis Magín Velázquez, who testified that he was the neighbor of the victim's parents, that he was the best man in appellant's and the deceased's wedding. On the night of the events he was in his house and upon hearing the shooting coming from Armando Jiménez' house, he told his wife to call the police and he went there. That he saw defendant when he ran out and when he boarded his bus and went in the direction to Carolina. That the deceased's mother called him asking for help. That first he heard continuous shots, about four, and that about one minute or a minute and a half later, he heard two or three more shots. That he entered the house and in the first room he found Evangélica between the chest of drawers and the wall. He raised her and noticed a wound and proceeded to lay her down on the bed. (Tr. Ev., Part IV, 421–501.)

The eleventh and last witness for the prosecution was Esteban Santiago Echevarría, who testified in relation to the six bullet caps (Exh. IX) admitted in evidence and who marked them with some lines inside those caps. (Tr. Ev., Part IV, 502.)

The evidence for the defense, as the Solicitor General points out in his brief, centered on "aspects and circumstances foreign to the facts, mainly of expert nature."

The first witness for the defense was Braulio Muñoz, keeper of arms of the police. He was brought to testify on the license to have and possess a weapon corresponding to Harry

Jiménez Rivero (brother of the victim's father). With his revolver the victim's father fired at the defendant.

The second witness for the defense was Jorge Luis Reyes, state policeman. He testified that in his presence Armando Jiménez delivered a revolver to policeman José I. Santini.

The third witness was Camilo Arcelay, expert in ballistics. He worked for the police for thirteen years. His testimony was centered mainly on projectiles discharged on the night of the events and the effects and characteristics of the latter in the body of the deceased. To questions of the defense he testified that according to the entrance orifices described by the pathologist in his Autopsy Report, these orifices should have been the result of two firearms of different calibers. (See Tr. Ev., Part VI, 43–206.)

The fourth and fifth witnesses presented by the defense were defendant's two sisters, Gloria and Georgina Prados García, who testified in relation to the family relations between defendant and the deceased, trying to establish the cordiality thereof.

Appellant assigns on appeal the commission of eleven errors, to wit:

"1. The trial court erred in failing to reasonably exclude juror Ada Beauchamp, upon motion of the defense, for which reason appellant did not have an impartial and fair trial.

"2. The trial court erred in denying the motion for new trial.

"3. The trial court erred in permitting the administering of the 'voir dire' in relation to juror Roberto Valés; that the prosecuting attorney examined him again without a basis therefor, and then took peremptory challenge against him, all with the objection of the defense.

"4. The trial court erred in failing to give instructions on voluntary manslaughter as requested in a document attached to the record.

"5. The trial court erred in giving instructions on escape, because the latter were not justified and were prejudicial to the defendant. (Tr. 21 Instructions.)

"6. The trial court erred in failing to give the instructions marked 2 to 10 in the petition for instructions filed by the defense, which appears in the record.

"7. The trial court erred in failing to admit certain documentary evidence to buttress the competence of the expert in ballistics, Camilo Arcelay.

"8. The trial court erred in permitting the prosecuting attorney to present a detailed theory in which he referred to inadmissible former acts of violence against the victim attributed to defendant and which the court repeated upon referring to the theory of the prosecuting attorney in the turn for the summary of the evidence to the jury and in admitting indirect acts of aggression through witness Tomasa Rivera, the victim's mother, as to the obstinacy of the prosecuting attorney in calling Dr. Rivera Ayala in the presence of the jury to establish, by inferences, aggressions to the victim on the part of defendant.

"9. The trial court erred in admitting evidence through the witness for the prosecution, Ángel Luis Flores, to the effect that on occasions prior to December 2, 1964, and as remote as 1963, he saw defendant carrying a revolver.

"10. The trial court erred in permitting the pathologist to testify on matters proper of an expert in ballistics and for which the latter was not qualified.

"11. The trial court erred in taking for granted that if it was believed that defendant made certain statements, the same would constitute an admission." (Tr. Ev., Part VIII, 23–24.)

The errors assigned were not committed.

■ (1–3) We shall discuss jointly the first three errors assigned. As to the first error assigned, failing to reasonably exclude Ada Beauchamp, it is proper to point out in the first place that, either sustaining or denying challenges for cause is in a great measure discretionary with the court. *People* v. *Gallart*, 11 P.R.R. 361 (1906) ; *People* v. *Vázquez*, 68 P.R.R. 62 (1948). In examining the transcript of evidence in relation to the interrogatory to which said juror Beauchamp was submitted during the drawing of the names of jurors, the latter stated that during the school vacations, from May to August, she heard her daughter's comments in her house in

relation to the facts of the case, but that she did not give them any consideration. Before said events she had heard no version. She answered that she had formed no opinion on the basis of said version, and that furthermore, her daughter did not express any opinion as to whether defendant was innocent or guilty. To questions by the judge she declared that in the event that the evidence presented in the court was completely different to the version given by her daughter, she would take as basis for her decision the evidence presented in court, and that she would not take into consideration her daughter's version. The court did not abuse its discretion in denying the challenge for cause of juror Beauchamp. See *People* v. *Rivera*, 83 P.R.R. 452, 458 (1961).

In relation to the motion for new trial, the same was based on the sworn statement given by juror Angelita López Román and on her testimony in the hearing of the motion for new trial. In the sworn statement this juror stated that after the jury was impaneled and before commencing the presentation of the evidence and during the course of the trial, jurors Beauchamp and Julia Ríos Maldonado, and a substitute juror, expressed opinions adverse to defendant, stating that the latter had committed the offense and that he was guilty. That furthermore juror Beauchamp, on more than one occasion during the recesses, stated that she had been threatened and that she was going to tell it to the judge. To questions posed by the prosecuting attorney, she stated that defendant's relatives had approached her and that she was doing a favor, and that if she was mistaken, there was a judge in heaven. That on several occasions defendant's sisters had asked her for help and that she had prayed to God to enlighten her. She assured that the alleged comments of the jurors did not affect her mind upon voting in favor of finding defendant guilty of murder in the second degree.

■ The court did not err in denying the motion for new trial. It was not established that the impartiality of the jury

was affected and even less, that the foregoing had deprived the jurors in this case from exercising reason and serene judgment in judging the facts before them. It must also be assumed that the jury based its verdict on the evidence introduced and not on extraneous facts or under undue influence or pressure. We understand that this presumption was not overcome in the case at bar. *People* v. *Díaz*, 74 P.R.R. 348 (1953); *People* v. *Emmanuelli*, 67 P.R.R. 626 (1947) and *People* v. *Báez*, 45 P.R.R. 498 (1933).

The third error challenges the discretion of the court in permitting the administering of the "voir dire" in relation to juror Roberto Vales, giving rise to the prosecuting attorney's peremptory challenge and to the coming of other jurors, who, in the opinion of defendant, were not acceptable. It suffices to reaffirm the discretion of the judge in relation to the process of selection and impaneling of the jurors.

■ (4) Defendant assigns the error of the court in failing to give the jury instructions on voluntary manslaughter. After examining the evidence presented we have found no basis for such instructions, there being no evidence whatsoever as to sudden quarrel or heat of passion. The evidence established that the interchange of shots between the defendant and his father-in-law occurred after appellant had fired against his wife.

In *People* v. *Serbiá*, 75 P.R.R. 370 (1953), we stated at p. 373:

"Undoubtedly, in a murder case the trial court must instruct the jury as to manslaughter if there is some evidence in the record which would justify a verdict of manslaughter. [Citations] Even if this evidence is slight or weak, it must be weighed by the jury, not by the court. *On the other hand, the trial court may not give instructions as to manslaughter if the record is barren of testimony which would support such a verdict.* [Citations] To permit the latter practice would be in effect to enable the jury to impose punishment different from that prescribed for the offense which was in fact committed." (Italics ours.)

See, also, the cases of *People* v. *Galarza*, 71 P.R.R. 520 (1950) ; *People* v. *Carrión*, 35 P.R.R. 828 (1926) ; *People* v. *Burgos*, 76 P.R.R. 187 (1954) and *People* v. *Barreto*, 85 P.R.R. 723 (1962).

That is the reason why the judge was justified in transmitting the instructions of aggravated assault in the case of assault to commit murder and in refusing to give those of manslaughter in the case of murder.

■ (5) In relation to the instruction on escape, although it is true that it is correct in its text and that all the time the judge raised it as a matter of fact, as to the fact whether or not he escaped, to be settled by the jury and which they did not have to consider if they understood that there was no escape, we understand that in view of the facts of the subsequent shooting with the deceased's father and the short time elapsed from the time he left the scene of the events to the time when the defendant went to Manuel Santos Aragón and then to the police station (about 8 p.m., the events having occurred about 7:30 p.m.), such instructions as to escape were not proper under the facts of the case. But in the light of the overwhelming evidence of defendant's guilt, the fact of having given such instruction did not have decisive effect on the verdict returned.

(6) Appellant assigns that a series of instructions requested by the defense were not given. We have examined the latter in the light of the evidence presented and have found nothing to support appellant's position.

■ (7) The prosecuting attorney having accepted the competence of the expert witness presented by the defense, the presentation of the documents offered praising his work was not proper.

■ (8–9) The evidence presented to support the information of murder is so decisive that even if it were considered that admitting evidence on the strained relations be-

tween defendant and his wife constituted error, it would not justify the reversal of the judgment. The same happens with the evidence concerning the carrying of firearms prior to the day of the events.

(10) The remaining errors lack merit.

The judgment appealed from will be affirmed.

Mr. Chief Justice Negrón Fernández and Mr. Justice Santana Becerra did not participate herein.